IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SWEETWATER INVESTORS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:10-CV-223-WKW |
| | ) | [WO] |
| SWEETWATER APARTMENTS | ) | |
| LOAN LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sweetwater Investors, LLC, brings this diversity action against Defendants Sweetwater Apartments Loan, LLC, SIMA Corp. and James T. Knell, alleging breach of contract and fraud in connection with its purchase of a loan. Before the court is Defendants' motion for summary judgment (Doc. # 76), which has been fully briefed. (Docs. # 77, 93, 97.) After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that the motion is due to be granted in part and denied in part.

## I. JURISDICTION AND VENUE

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. § 1332(a). Personal jurisdiction and venue are not contested, and there are adequate allegations of both.

## II.  STANDARD OF REVIEW

On summary judgment, the evidence and the inferences from that evidence must be viewed in the light most favorable to the nonmovant.  *See Jean–Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).  Hence, "'facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.'" *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000)).

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation and internal quotation marks omitted); *see* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008); Fed. R. Civ. P. 56(c).  When the nonmovant fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to its case and on which the nonmovant will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex Corp.*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

## III. BACKGROUND

Today, Sweetwater Apartments is advertised as a luxury apartment development in beautiful Gulf Shores, Alabama, complete with an elegant clubhouse and a pool, a tiki hut for outdoor entertaining, tree-lined streets, lighted sidewalks, and three beautiful ponds with lighted fountains.[1]  While the Gulf Coast can almost

---

[1] Sweetwater Apartments, http://www.sweetwaterapts.net (Last visited August 30, 2011).

be seen from there, the visionaries behind the development, Sarah L. Edington and William E. Ware, faded out several years ago, when their limited liability company (Sweetwater Apartments GSA, LLC) defaulted on the $13.5 million loan obtained to finance the development and they became personally liable on the loan for millions of "clams."  A number of investors, who also signed limited guaranties for payment in favor of the lending bank (now Regions Bank), also are now personally liable for repayment of the loan in amounts ranging from $1 million to $7.2 million.  In January 2010, twelve of these investors formed their own Alabama limited liability company, Sweetwater Investors, LLC, which is the Plaintiff in this case.  Edington and Ware are not members of Plaintiff.

There are three Defendants.  Defendants Sweetwater Apartments Loan, LLC ("SW Loan") and SIMA Corp. ("SIMA") are affiliated California entities.  The individual Defendant is James Knell ("Knell").  He wholly owns SIMA, and is an agent of both SIMA and SW Loan.

The convergence of the business interests of the Alabama Plaintiff and the California Defendants began in October 2009, when SIMA bought the loan and the limited guaranties of payment from Regions Bank for $6.25 million.  (*See* SIMA-Regions Agreement (Doc. H to Doc. # 79); Pretrial Order ¶ 5 (Stipulations) (Doc. # 116).)  Plaintiff's members were in possession of and operating the property.  When

the sale was completed, the loan and guaranties were assigned to SIMA's affiliated entity, SW Loan.  (SW Loan Assignment (Ex. J to Doc. # 79); Pretrial Order § 5 (Stipulations).)  When representatives of the soon-to-be-formed Plaintiff learned of the sale and assignment of the loan, they set up a meeting with Mr. Knell in an effort to manage the impending foreclosure and their liabilities on the guarantees.  (Pretrial Order § 5 (Stipulations).)  At that meeting held on November 18, 2009, Mr. Knell informed them in no uncertain terms that SW Loan would execute on the limited guarantees of payment, unless an agreement was reached between SW Loan and the guarantors.  (John Buck Dep. 45-46 (Ex. K to Doc. # 79); Knell Dep. 90-93 (Ex. A to Doc. # 93).)  An agreement was reached, and that agreement is the Contract underlying this action.

SW Loan foreclosed the loan and bought Sweetwater Apartments at the foreclosure sale with a credit bid of $9.5 million.  On  January 11, 2010, seven days later, SW Loan and Plaintiff executed a contract for Plaintiff's purchase of the loan.[2]  (Contract (Ex. Q to Doc. # 79); Pretrial Order § 5 (Stipulations).)  That purchase included the transfer and assignment of nineteen documents identified in Schedule 1 of the Contract.  Those documents, which comprised the "Loan" and the "Loan

---

[2] In essence, SW Loan had the right to possess the property and to collect the guaranties from Plaintiffs.

File" as defined in the Contract, included the limited guaranties of payment executed by Plaintiff's members, as well as the Edington/Ware limited guaranty of payment ("Schedule 1 Documents").  (*See* Contract, at 1 (Recitals) & Art. III, § 3.01 (Definitions).)  Plaintiff agreed to pay SW Loan $1 million, and amounts equaling security deposits and January rents, on or before January 12, 2010.  SW Loan agreed that, "[u]pon receipt" of the $1 million payment, security deposits, and January rents, it would, among other things, "sell, assign, transfer and convey the Loan" to Plaintiff. (Contract ¶ (e).)  SW Loan further agreed that it would "cause to be delivered to [Plaintiff] all documents listed in Schedule '1.'"  (Contract ¶ (e).)  The Schedule 1 Documents were paramount to Plaintiff because, without lawful ownership of them, Plaintiff would be unable to collect on the limited guaranty from Edington or Ware, who were non-participants in the deal with SIMA, SW Loan and Mr. Knell.  (*See* Kathleen Ferrell Dep. 99 (explaining that Plaintiff's "whole purpose" was to purchase the limited guarantees of payment "so [its members] could turn around and go back after" Mr. Ware and Ms. Edington and their company, and also obtain Plaintiff's members' "personal release . . . from Regions [Bank]" (Ex. B to Doc. # 79).)  When it was all said and done, SW Loan had purchased the real property in foreclosure and had possession of it, and Plaintiff had bought its peace with SW Loan by the payment of the $1 million.

Plaintiff paid the $1 million and $33,737.90 for security deposits and January rents by the Contract deadline.  (Knell Dep. 123.)  Further calculations revealed that the $33,773.90 payment omitted approximately $3,000 for prepaid January rents, but that shortfall was rectified on January 27, 2010.  (John Buck Aff. 1 (Ex C to Doc. # 93).)  However, the Schedule 1 Documents were not forthcoming "upon receipt" of Plaintiff's payment.

In March 2010, having yet to receive the Schedule 1 Documents, Plaintiff filed this lawsuit against Defendants, alleging breach of contract, fraud and fraudulent suppression.  Plaintiff still was waiting for the Schedule 1 Documents when it amended the Complaint in May 2010; hence, the allegation remained that the Contract had been breached by SW Loan's refusal to the transfer the Schedule 1 Documents.[3]  (Compl. ¶ 23 (Doc. # 1); Am. Compl. ¶ 23 (Doc. # 18).)  The Amended Complaint also includes a claim for fraud and fraudulent suppression against Defendants collectively.  Plaintiff contends that, in pre-contractual negotiations, Mr. Knell falsely represented that Defendants "had full control of and right to transfer all documents referenced in the [Contract]."  (Pl. Answers to Defs. Interrog. ¶ 3 (Ex. W

---

[3] Although Plaintiff brought the breach-of-contract claim against all Defendants, SIMA and Mr. Knell have been dismissed on this count.  Hence, SW Loan is the only Defendant as to the breach-of-contract claim.  (Mem. Op. & Order (Doc. # 39).)  SIMA and Mr. Knell remain Defendants on the fraud and fraudulent suppression claims.

to Doc. # 79); *see also* Knell Dep. 150 (testifying that he "was always under the assumption" that he "had to right to transfer the documents . . . or the personal guaranties" and that he "conveyed that assumption" to Plaintiff's representatives; Am. Compl. ¶ 20.)  As grounds for its fraud claim, Plaintiff alleges that Defendants "either knew that the representations were false or without knowledge of the true facts, recklessly misrepresented them to Plaintiff or made the representations by mistake but with the intention that Plaintiff should rely upon them."  (Am. Compl. ¶ 24.)  Additionally as grounds for its fraudulent suppression claim, Plaintiff alleges that "Defendants had a duty to disclose [to Plaintiff] the fact that Defendants did not have possession or ownership of the [Schedule 1 Documents]."  (Am. Compl. ¶ 32.)  Compensatory and punitive damages are sought on the fraud and fraudulent suppression claims.

It is undisputed that in November 2010, approximately ten months after Plaintiff's payment to SW Loan of the $1 million and eight months after this lawsuit was filed, SW Loan assigned and delivered the Schedule 1 Documents to Plaintiff. (Pretrial Order § 5 (Stipulations).)  As to SW Loan's reason for the ten-month delay, it asserts that, after the Contract was executed, SW Loan discovered the anti-

assignment clause in the Regions-SIMA Agreement.[4]   The anti-assignment clause provides, in part, that "[t]his Agreement may not be assigned by either party without the express written consent of the other party[,]" and "[a]ny purported sale, transfer or assignment of the Asset without compliance with [this] Section . . . shall be null and void and of no effect."   (Regions-SIMA Agreement ¶ 25; *see also* SW Loan Assignment ¶ 4 ("Buyer shall not assign, sell or otherwise transfer the Asset without the prior written consent of Seller . . . .").)   SW Loan initially questioned whether that clause (that it had agreed to) precluded the transfer of the Schedule 1 Documents from SW Loan to Plaintiff, absent Regions Bank's consent.[5]   (Jeremy Retherford Dep. 108-09, 114, 122 (Ex. P to Doc. # 79); Email from Jeremy Retherford, Esq., to Ed Price, Esq., dated Jan. 11, 2010 (Ex. H to Doc. # 98).)[6]

---

[4]   This "discovery" is odd, in that Mr. Knell, an agent for both SW Loan and SIMA, signed the Regions-SIMA Agreement in his capacity as SIMA's chairman.   (Regions-SIMA Agreement 16.)

[5] The Regions-SIMA Agreement gave SIMA the right to transfer the purchased assets to an "affiliated entity," here SW Loan.   (Regions-SIMA Agreement ¶ 25.)   There is no challenge in this lawsuit to the validity of this assignment.   As to the assignment from SW Loan to Plaintiff, restrictive terms for Regions Bank's consent were offered to Plaintiff in January 2010, to include a provision that Plaintiff release Regions Bank from any liability on the loan, but those terms were not agreeable to Plaintiff.   (Email between SW Loan and Regions (Ex. S to Doc. # 79); Jeremy Retherford Dep. 108, 121 (Ex. P to Doc. # 79); *see generally* Defs. Summ. J. Br. 7).)

[6] Jeremy Retherford, Esq., represented SW Loan in purchase of Sweetwater Apartments out of foreclosure.   (Retherford Dep. 15.)

In their summary judgment briefs, the parties vigorously dispute whether the anti-assignment clause is valid in the first instance.  (*Compare* Defs. Summ. J. Br. 13-18 (Doc. # 77), *with* Pl. Summ. J. Resp. 15-20 (Doc. # 93).)  Defendants now say that the anti-assignment clause is not enforceable.  This is because, according to Defendants, an anti-assignment clause becomes inoperative and cannot prevent an assignment when the contract containing the anti-assignment clause has been fully performed.  Defendants contend that the Regions-SIMA Agreement was fully performed prior to the execution of the Contract between Plaintiff and SW Loan. (Defs. Summ. J. Br. 12-14.)  However, for reasons unexplained in the record, this conclusion apparently was not reached until November 2010, when SW Loan assigned and delivered the Schedule 1 Documents to Plaintiff.

Plaintiff, on the other hand, says that the anti-assignment clause voids the assignment, absent Regions Bank's consent, and, thus, "clouds [Plaintiff's] title to the guaranties." (Pl. Summ. J. Resp. 19; Retherford Dep. 122-23.)  As urged by Plaintiff, "tender of a clouded title is [not] sufficient performance [under a contract] when clear title was bargained for."  (Pl. Summ. J. Resp. 19; *see also* Pretrial Order § 4 (Pl. Contentions).)  Regardless of which party is correct, at the very least, the evidence establishes that the existence of the anti-assignment clause in the Regions-SIMA Agreement is the reason for the holdup in the assignment and delivery of the

Schedule 1 Documents. (*See, e.g.*, Retherford Dep. 121-22; *see also* Buck Aff. (attesting that Defendants informed Plaintiff, after payment of the $1 million, that "they could not deliver" the Schedule 1 Documents without violating the anti-assignment clause in the Regions-SIMA Agreement).)

Plaintiff further contends that the untimely delivery of the Schedule 1 Documents is a breach of the Contract in and of itself, and that it has been damaged in its inability to proceed earlier against the now bankrupt makers of the Edington/Ware limited guaranty of payment. (*See, e.g.*, Pl. Summ. J. Resp. 20-21, 29.) Against this backdrop, the court turns to the merits of the pending summary judgment motion.

## IV. DISCUSSION

### A.   <u>**Breach of Contract**</u>

Plaintiff proceeds on a breach-of-contract claim against SW Loan. Under Alabama law, to state a claim for breach of contract, a plaintiff must allege "'(1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.'" *Barrett v. Radjabi-Mougadam*, 39 So. 3d 95, 98 (Ala. 2009) (quoting *Shaffer v. Regions Fin. Corp.*, 29 So. 3d 872, 880 (Ala. 2009)). Element one is not disputed. Elements two, three and four are.

11

### 1.    *Plaintiff's Performance Under the Contract (Element Two)*

Defendants argue that Plaintiff materially breached the Contract by failing to remit the $3,000 payment for prepaid January rents by the January 12, 2010 Contract deadline.  Plaintiff contends, however, that the arguably seventeen-day late payment of ".00386% of the [total] purchase price was a minor error in calculation that was corrected immediately upon discovery and does not relieve . . . SW Loan of its duty to perform under the Contract."  (Pl. Summ. J. Resp. 23.)

"[T]o prevail on a breach-of-contract claim, a plaintiff must prove . . . [its] own performance under the contract."  *Superior Wall & Paver, LLC v. Gacek*, No. 2090967, 2011 WL 2279215, at *6 (Ala. Civ. App. June 10, 2011) (published) (citing *State Farm Fire & Cas. Co. v. Williams*, 926 So. 2d 1008, 1013 (Ala.  2005)).  This means that "the plaintiff must prove that it substantially performed its obligations under the contract."  *Id.* (citing *Mac Pon Co. v. Vinsant Painting & Decorating Co.*, 423 So. 2d 216, 218 (Ala. 1982)).  "Substantial performance of a contract does not contemplate exact performance of every detail but performance of all important parts."  *Id.*  "Whether a party has substantially performed a promise under a contract is a question of fact to be determined from the circumstances of each case."  *Cobbs v. Fred Burgos Constr. Co.*, 477 So. 2d 335, 338 (Ala. 1985).

Here, there is evidence that by the January 12, 2010 Contract deadline, Plaintiff had paid SW Loan $1,060,353.90. That amount was more than 99.5 percent of the monetary obligation Plaintiff owed under the Contract. There also is evidence that seventeen days later, Plaintiff remitted the approximate $3,000 shortfall for prepaid January rents, and there is no evidence that the payment was rejected. Applying *Superior Wall & Paver*'s holding, the court finds that the evidence is sufficient to create a genuine issue of material fact as to whether Plaintiff substantially performed its obligations under the Contract. Therefore, that issue is for the jury to decide, not the court at summary judgment.

### 2.   *SW Loan's Performance (Element Three)*

SW Loan points to the undisputed fact that, in November 2010, SW Loan tendered to Plaintiff all of the documents it was obligated to deliver under the Contract. SW Loan argues that this performance is "full performance of the Contract" and "renders a breach of contract claim impossible as a matter of law." (Defs. Summ. J. Br. 13.) In its opening summary judgment brief, SW Loan does not address the timing of the delivery of the Schedule 1 Documents, *i.e.*, ten months after the January 2010 payment of $1 million from Plaintiff to SW Loan and eight months after the March 2010 filing of this lawsuit. However, in reply to Plaintiff's response that SW Loan's performance came too late (Pl. Summ. J. Resp. 20-21), SW Loan

13

retorts that "[b]ecause the failure to deliver the [Schedule 1] [D]ocuments [is] the singular breach alleged . . . in [the] complaint, there are no other grounds Plaintiff can now claim to support its breach of contract claim." (Defs. Summ. J. Reply 19 (Doc. # 97); *see also* Am. Compl. ¶ 16 ("Defendants have failed or refused to transfer the Loan and Loan File to Plaintiff despite Plaintiff's performance under the Agreement and demand for said transfer.").) The essence of SW Loan's argument is that it remedied the allegation in ¶ 16 of the Amended Complaint by delivering the Schedule 1 Documents to Plaintiff in November 2010, and, therefore, Plaintiff's breach-of-contract claim fails, at least absent an amendment to the Amended Complaint expressly alleging that SW Loan's post-lawsuit contractual performance in November 2010 was untimely. This argument lacks a principled foundation.

In the Complaint, filed in March 2010, Plaintiff alleges that SW Loan's failure to transfer the Schedule 1 Documents is the act that breached the Contract. (Compl. ¶ 23; *see also* Am. Compl. ¶ 16.) SW Loan does not dispute that in March 2010, it had not assigned or transferred those documents, and there is no evidence that it had. In fact, SW Loan's summary judgment brief notably lacks any argument that SW Loan was *not* in breach of the Contract in March 2010. Nor does SW Loan's brief explain why its subsequent performance in November 2010 should be deemed timely as a matter of law. On this record, whether the breach was complete when the

Complaint was filed is an issue for the jury to decide, the same as the argument, if it is to be made, that the November 2010 performance was timely.

Moreover, it should have been no surprise to SW Loan that, in its summary judgment response, Plaintiff challenged the timeliness of the post-lawsuit delivery of the Schedule 1 Documents.  (Pl. Summ. J. Resp. 20-21 (arguing that SW Loan's performance under the Contract was not timely); *see also* Pl. Summ. J. Resp. 29 ("[T]he factual predicate for damages is the breach of the Contract by [SW Loan] when it failed to timely deliver the Schedule 1 Documents . . . .").)  Under Plaintiff's interpretation of the Contract, *i.e.*, that no time was prescribed in the contract for SW Loan's delivery of the Schedule 1 Documents (an interpretation which presently is not challenged by SW Loan), "the law requires the obligated party to perform within a 'reasonable time.'"  *Lemon v. Golf Terrace Owners Ass'n*, 611 So. 2d 263, 265 (Ala. 1992).  It can be inferred from the Amended Complaint, without stretch, that, when the Complaint was filed, Plaintiff deemed that a reasonable period of time had elapsed without SW Loan having performed its end of the Contract.  Additionally, it is reasonable to infer from the Amended Complaint that, as Plaintiff argues, SW Loan's "ability to transfer the Schedule 1 Documents without further approval, consent or permission was an item for which Plaintiff specifically bargained . . . ."

15

(Pl. Summ. J. Resp. 20.)  Accordingly, permitting Plaintiff to proceed on its claim that SW Loan's performance was untimely will not prejudice SW Loan.

On this record, both the length of the delay (ten months) and the timing of the delay (eight months after this lawsuit was filed) present sufficient circumstances to raise a genuine issue of material fact as to whether SW Loan's performance under the Contract was timely.  *Lemon* supports this conclusion.[7]  *See* 611 So. 2d at 265 ("What is a reasonable time depends on the nature of the act to be done and all of the circumstances relating to that act.  This, necessarily, is a question to be determined by the trier of fact.").

### 3.   *Damages (Element Four)*

Damages for breach of contract are that sum which would place the injured party in the same condition he would have occupied if the contract had not been breached.  *See Brendle Fire Equip. v. Elec. Eng'g, Inc.*, 454 So. 2d 1032, 1034 (Ala.

---

[7] As stated earlier in this opinion, Plaintiff also contends that an anti-assignment clause in the contract governing the bank's sale of the loan and guaranties to SIMA "clouds [Plaintiff's] title to the guaranties."  (Pl. Summ. J. Resp. 19.)  As urged by Plaintiff, "tender of a clouded title is [not] sufficient performance [under a contract] when clear title was bargained for."  (Pl. Summ. J. Resp. 19.)  Because summary judgment on the breach of contract claim is due to be denied on timeliness grounds, it is unnecessary at present to reach Plaintiff's other arguments, and no opinion on the merits of those arguments is expressed in this opinion.

Additionally, Plaintiff argues that SW Loan breached the Contract by failing to pay Plaintiff's attorney's fees. (*See* Contract Art. IV, § 4.13 (providing that in any litigation dispute, the prevailing party "shall be entitled to attorneys' fees . . . incurred by reason of such action"; Am. Compl. ¶ 17.)  As the court indicated at the pretrial hearing, the issue of attorney's fees will be decided post-trial, when there is a prevailing party.

Civ. App. 1984).  Plaintiff alleges that it has been damaged by SW Loan's untimely performance because "it has been deprived of an asset worth $3,850,000.00." (Pretrial Order § 4 ¶ l.)  That asset is the Ware/Edington limited guaranty of payment. (Pl. Summ. J. Resp. 25.)  Defendants argue that these guarantors are insolvent, in part, based upon their bankruptcy filings and, thus, that they have no recoverable assets. Defendants also contend that, at best, the recovery of damages is speculative.  (Defs. Summ. J. Br. 20-22.)

Plaintiff may well have a difficult road in proving that, but for the alleged breach, it could have enforced and collected on the Edington/Ware limited guaranty. However, the court finds that the issue of damages is better sifted during trial than on the present summary judgment record.  Moreover, whether Plaintiff can prove actual damages is not dispositive of the breach-of-contract claim.  "Alabama law provides for nominal damages if a breach of contract is proven, even if a breach-of-contract plaintiff cannot prove actual damages."  *Knox Kershaw, Inc. v. Kershaw*, 552 So. 2d 126, 128 (Ala. 1989); *see also James S. Kemper & Co. Se., Inc. v. Cox & Assocs., Inc.*, 434 So. 2d 1380, 1385 (Ala. 1983) ("When the evidence establishes a breach, even if only technical, there is nothing discretionary about the award of nominal damages.").  Accordingly, summary judgment on Plaintiff's breach-of-contract claim

could not properly be entered solely on the basis of a lack of proof of actual damages, given the availability of nominal damages.

## B. **Fraud**

"The elements of fraud are: (1) a misrepresentation of a material fact, (2) made willfully to deceive, recklessly, without knowledge, or mistakenly, (3) that was reasonably relied on by the plaintiff under the circumstances, and (4) that caused damage as a proximate consequence." *McCutchen Co., Inc. v. Media Gen., Inc.*, 988 So. 2d 998, 1001 (Ala. 2008).

Defendants argue that Plaintiff's fraud claim fails because (1) there is no evidence of any misrepresentation of a material fact, (2) there is no evidence that Plaintiff reasonably relied on any alleged pre-contractual representation, (3) there is no evidence of an intent to deceive sufficient to warrant punitive damages, (4) the release clause in the Contract bars the fraud claim, and (5) this claim is nothing more than a breach-of-contract claim. These arguments are addressed in turn.

### 1. *The Alleged Misrepresentation of Material Fact*

Plaintiff predicates its fraud claim on pre-contractual representations allegedly made by Mr. Knell that he "had full ownership" of the Schedule 1 Documents and "could negotiate [their] sale and transfer." (Am. Compl. ¶ 20.) Defendants argue that there is no evidence to back up the "bald allegations of the Amended Complaint."

18

(Defs. Summ. J. Br. 26.)   They contend that deposition testimony, from both Plaintiff's and Defendants' representatives, reveals that "the statements actually made by [Mr.] Knell are not remotely like the alleged representations Plaintiff allegedly relied upon." (Defs. Summ. J. Br. 26; *see also* Defs. Mot. Strike 2-3 (Doc. # 99).) Defendants contend that the evidence reveals only that Mr. Knell informed Plaintiff's representatives that "he was the man to talk to regarding the loan and guaranties and that he would move against the . . . guarantors unless a deal was made." (Defs. Summ. J. Br. 27.)

This line of argument ignores Plaintiff's answer to an interrogatory propounded by Defendants.   In that interrogatory answer, Plaintiff attests that Defendants represented to it that they "had full control of and right to transfer all documents referenced in the [Contract]." (Pl. Answers to Defs. Interrogs. ¶ 3; *see also* Pl. Summ. J. Resp. 3, 30-31.)  An answer to an interrogatory is evidence that a plaintiff can use to show that a fact "is genuinely disputed." Fed. R. Civ. P. 56(c). No reason has been given by Defendants that would permit the court to disregard this evidence at the summary judgment stage. (*See* Defs. Summ. J. Br. 26-27.)  Hence, even assuming that Defendants are correct that Plaintiff inaccurately summarized the deposition testimony, the clear interrogatory answer cannot be ignored.  Because weighing the

evidence is not permitted at the summary judgment stage, the contradiction in the evidence creates a "genuine dispute as to [a] material fact."  Fed. R. Civ. P. 56(a).

Alternatively, Defendants argue that, even assuming that Mr. Knell said what Plaintiff claims he said, no claim for fraud can lie because Mr. Knell's statement actually turned out to be true.[8]  The representation is true because, according to Defendants, the anti-assignment clause in the Regions-SIMA Agreement was unenforceable in and of itself or, at the very least, by Plaintiff.  (Defs. Summ. J. Brief 25-26.)  This argument overlooks the necessary implication arising from Mr. Knell's representation concerning his "full control of and right to transfer" the Schedule 1 Documents (Pl. Answers to Defs. Interrogs. ¶ 3), namely, that he could transfer the Schedule 1 Documents to Plaintiff immediately (and certainly without a ten-month delay).  Even if, as Defendants argue, the anti-assignment clause was unenforceable, there is evidence that Mr. Knell's power to transfer the Schedule 1 Documents to Plaintiff was hindered and delayed ten months during the pendency of the investigation into the enforceability of the anti-assignment clause in the Regions-SIMA Agreement.  In this regard, there is sufficient evidence from which a reasonable jury could infer that Mr. Knell's statement was false.

---

[8] As framed by Defendants, whether Mr. Knell's statement was true hinges on the conclusion that the anti-assignment clause in the Regions-SIMA Agreement is not enforceable, an issue not addressed in this opinion, *see supra* note 7.

## 2.    *Reliance*

Defendants argue that certain provisions in the Contract make Plaintiff's reliance on Mr. Knell's alleged pre-contractual representation unreasonable as a matter of law.  One provision expressly excludes Plaintiff's reliance on any extra-contractual oral or written statements made by SW Loan's agents, "other than those specifically contained in th[e] [Contract]."[9]  (Contract ¶ (f).)  The other provision is a merger clause that indirectly excludes reliance on extra-contractual statements "not expressly set forth or referred to" in the Contract by barring extraneous evidence to prove the Contract's terms.  (Defs. Suppl. Summ. J. Mem. 2-3 (Doc. # 89).)  Both clauses, in effect, invoke the parol evidence rule, "which precludes a court from considering extrinsic evidence of prior or contemporaneous agreements in order to 'change, alter, or contradict' the terms of the integrated contract."  *Ritter v. Grady Auto. Group, Inc.*, 973 So. 2d 1058, 1062 (Ala. 2007); *see also Harbor Vill. Home Ctr., Inc. v. Thomas*, 882 So. 2d 811, 816 (Ala. 2003) ("A merger clause, also known as an integration clause, 'is a portion of a particular contract that restates the rationale of the parol evidence rule within the terms of the contract.'" (quoting *Envtl. Sys., Inc. v. Rexham Corp.*, 624 So. 2d 1379, 1383 (Ala. 1993))).

---

[9] This provision will be referred to as the "no-reliance" clause.

21

Mr. Knell's alleged pre-contractual false statement is embodied in the Contract provision providing that SW Loan "represents to [Plaintiff] that [SW Loan] is the owner of Loan and has the authority to transfer the Loan as provided in this [Contract]." (Contract 2.)  Hence, Mr. Knell's alleged extraneous false statement mirrors, rather than contradicts, the Contract's terms, and the parol evidence rule does not bar evidence of a prior, consistent statement that neither changes, alters nor contradicts the terms of the integrated Contract.  Additionally, the language in both clauses does not operate to abrogate reliance on a false statement that is expressly included in the Contract.  Therefore, it cannot be said as a matter of law that either the no-reliance clause or the merger clause forecloses the reliance element of Plaintiff's fraud claim predicated on alleged extraneous misrepresentations that subsequently were incorporated into the Contract.

Moreover, Defendants' argument omits mention of the well established, Alabama law that the parol evidence rule "has no application in an action alleging fraud." *Envtl. Sys., Inc.*, 624 So. 2d at 1382 (collecting cases).  "Parol evidence is admissible to show that a written agreement was procured by fraud," *id.* (internal quotation marks and citations omitted), and "[a] stipulation in the written contract that there are no verbal understandings not incorporated herein does not estop the party to set up fraud in verbal misrepresentations inducing the contract as a whole." *Id.*

22

(internal quotation marks and citations omitted).  Similarly, because a merger clause "restates the rationale of the parol evidence rule within the terms of the contract," it "is also not applicable to exclude evidence relating to fraud claim."  *Id.* at 1383. Here, because Plaintiff's claim avers fraud, neither the parol evidence rule nor the merger clause would exclude extraneous evidence of representations made before, or contemporaneously with, the execution of the written Contract.

### 3.    *Punitive Damages*

Under Alabama law, "upon a finding of an intent to deceive or defraud, punitive damages may be awarded." *Ford Motor Co. v. Sperau*, 708 So. 2d 111, 116 (Ala. 1997) (per curiam).  By statute, an award of punitive damages in this case would require proof "by clear and convincing evidence that [Defendants] consciously or deliberately engaged in . . . fraud . . . ." Ala. Code § 6-11-20(a).  Fraud is defined as "[a]n intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury." *Id.* § 6-11-20(b)(1).

Defendants argue that there is no evidence that, when Mr. Knell allegedly represented that he had full authority to transfer the Schedule 1 Documents to

Plaintiff, that he knew that he would not be able to effectuate that transfer until some ten months later. Hence, Defendants argue that the absence of evidence that Mr. Knell made any representation with an intent to deceive precludes an award of punitive damages on the fraud claim. (Defs. Summ. J. Br. 30.)

All of the evidence has been studied. It seems highly dubious that the summary judgment record contains sufficient evidence to raise a genuine issue of material fact that Defendants' conduct was "gross, oppressive or malicious." The merits of Defendants' argument need not be analyzed any further, however, because the court finds that Plaintiff has abandoned any right to the recovery of punitive damages. In its summary judgment response, Plaintiff does not argue that punitive damages are appropriate or point to any evidence of an intent to deceive. In fact, Plaintiff takes the position that its fraud claim does not require proof of an intent to deceive.[10] (Pl. Summ. J. Resp. 39.) Absent any citation to evidence indicating an intent to deceive or relevant argument, Plaintiff fails to demonstrate that the evidence "is genuinely

---

[10] Plaintiff is correct that the absence of evidence of an intent to deceive would not foreclose Plaintiff's legal fraud claim *in toto*. Compensatory damages still would be available for innocent fraud. *See Lewis v. First Tuskegee Bank*, 964 So. 2d 36, 42 (Ala. Civ. App. 2007) (Even where a misrepresentation is "made by mistake and without any intent to deceive, it may constitute legal fraud if it is regarding a material fact and is acted upon with belief in its truth by one to whom it is made" (citation omitted)); *see also Ex parte Lewis*, 416 So. 2d 410, 412 (Ala. 1982) ("A claim of fraud . . . of the 'innocent' or 'legal' species carries no requirement of proof that the defendant had knowledge of the falsity of the matter represented, only that the defendant misrepresented a material fact which was acted upon to the injury of the other party. While liability for innocent fraud is not dependent upon knowledge of the falsehood (and, therefore, not dependent upon an intent to deceive), compensatory damages only may be awarded.").

disputed" on the issue of punitive damages.  Fed. R. Civ. P. 56(c).  Moreover, Plaintiff did not preserve the issue of punitive damages in its contentions in the Pretrial Order.  *See* Fed. R. Civ. P. 16(d) (explaining that the pretrial order "controls the course of the action . . ."); *see also Morro v. City of Birmingham*, 117 F.3d 508, 515 (11th Cir. 1997) ("We have not hesitated to back up district courts when they put steel behind the terms of pretrial orders and hold parties to them."); *see also* Pretrial Order § 4, ¶ 1 (Pl. Contentions).)  Accordingly, summary judgment is due to be granted in Defendants' favor on Plaintiff's claim for punitive damages on the fraud claim.

### 4.    *Release*

Defendants argue that Plaintiff cannot bring a fraud claim "for actions taken by Defendants as part of preliminary discussions," given that the Contract released SW Loan from liability on any cause of action relating to the loan.  (Defs. Suppl. Summ. J. Mem. 3;  Contract, Art. II, § 2.01 (Release).)  Defendants did not raise release as an affirmative defense in their answers.  *See* Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . release." ); *see also* Fed. R. Civ. P. 12(b) ("Every defense to a claim for relief in any pleading must be asserted in the responsive

pleading if one is required.").  There being no argument that persuades otherwise, the defense is waived.  *See Proctor v. Fluor Enter.*, Inc.  494 F.3d 1337, 1350 (11th Cir. 2007) ("In general, a party's failure to raise an affirmative defense in the pleadings results in a waiver of the defense.").  The affirmative defense of release, thus, does not provide Defendants with a viable ground for summary judgment.

### 5.      *More Than a Mere Breach of Contract*

It is well established, under Alabama law, that "[a] mere breach of a contractual provision is not sufficient to support a charge of fraud."  *Brown-Marx Assoc., Ltd. v. Emigrant Sav. Bank.*, 703 F.2d 1361, 1370-71 (11th Cir. 1983) (applying Alabama law).  Defendants argue that Plaintiff is trying to erect a fraud claim out of a simple breach-of-contract claim, but that, in fact, Plaintiff's entire case is that Defendants did not comply with the Contract provision requiring delivery of the Schedule 1 Documents, and "nothing more."  (Defs. Summ. J. Br. 24.)  Defendants raised the identical argument at the motion to dismiss stage.  After examining the relevant Alabama case law, the court rejected the argument:

> As alleged, not only did [SW Loan] breach the [Contract] when it failed
> to deliver the [Schedule 1 Documents] to Plaintiff, but Defendants also
> induced Plaintiff to enter into the [Contract] knowing that they did not
> have the authority or ability to transfer the [Schedule 1 Documents] to
> Plaintiff, but representing that they did have such authority.  In reliance
> upon those representations, Plaintiff entered into the [Contract] with

> [SW Loan]. . . . .  In other words, as grounds for the fraud claim[ ],
> Plaintiff alleges that, prior to consummation of the Agreement,
> Defendants misrepresented . . . material facts regarding the difficulty or
> impossibility of obtaining ownership and possession of the [Schedule 1
> Documents] and permission from Regions Bank to transfer the
> [Schedule 1 Documents] to Plaintiff.

(Mem. Op. & Order 12 (Doc. # 39) (internal citations omitted).)

Of course, Plaintiff can no longer stand on the allegations in the Amended Complaint to defeat summary judgment. Indeed, the court observed in its prior opinion that, "[w]hether the evidence bears out these allegations is an issue suitable for presentation after discovery." (Mem. Op. & Order 13.)  Discovery now has been conducted, and evidence submitted on summary judgment.  As discussed earlier in this opinion, the evidence reveals a genuine issue of material fact whether during pre-contractual negotiations, Mr. Knell misrepresented to Plaintiff that Defendants "had full control of and right to transfer all documents referenced in the [Contract]," and, conversely, whether Mr. Knell fraudulently suppressed that "full control" and "right to transfer" meant "full control" and "right to transfer" in ten months.  (Pl. Answers to Defs. Interrogs. ¶ 3.)  Because the evidence "bears out the allegations," summary judgment is due to be denied on this ground.

C.   **Fraudulent Suppression**

In the Amended Complaint, Plaintiff brings a fraudulent suppression claim against all Defendants.  It contends that Mr. Knell's alleged statement – that he had full authority to assign the Schedule 1 Documents – is fraudulent not only because of what it misrepresents but also because of what it suppresses or conceals. Defendants argue that they are entitled to summary judgment on this claim.

The summary judgment motion and briefing preceded the entry of the Pretrial Order.  In its contentions in the Pretrial Order, Plaintiff does not include a claim for fraudulent suppression.  Plaintiff's claims are limited to fraudulent misrepresentation and breach of contract.  (*See* Pretrial Order § 4, ¶¶ b, e, g.)  Accordingly, Plaintiff has abandoned reliance on the fraudulent suppression claim by its failure to preserve the claim in its contentions incorporated in the Pretrial Order.  *See* Fed. R. Civ. P. 16(d) (explaining that the pretrial order "controls the course of the action . . ."); *see also Morro*, 117 F.3d at 515.  The summary judgment motion on this claim is, thus, due to be granted.

## V.  CONCLUSION

Based on the foregoing, Plaintiff Sweetwater Investors, LLC's breach-of-contract claim against SW Loan, and the fraud claim against all Defendants for

compensatory damages, survive summary judgment.  However, summary judgment is due to be entered in Defendants' favor on Plaintiff's fraud claim for punitive damages and on the fraudulent suppression claim.  Accordingly, it is ORDERED that Defendants' motion for summary judgment (Doc. # 76) is GRANTED in part and DENIED in part.

DONE this 30th day of August, 2011.

_____ /s/ W.  Keith Watkins _____
CHIEF UNITED STATES DISTRICT JUDGE